**CONTINENTAL CASUALTY COMPANY, Plaintiff,**

v.

**The HARTFORD FIRE INSURANCE COMPANY, Defendant.**

**Civil Action No. 94–2335 (JLG).**

United States District Court, District of Columbia.

July 25, 1996.

Sean M. Hanifin, William D. Hopkins, and R. Darryl Cooper, Ross, Dixon & Masback, Washington, D.C., for Plaintiff.

William J. Bowman and James P. Ruggeri, Hogan & Hartson, Washington, D.C., for Defendant.

*MEMORANDUM*

JUNE L. GREEN, District Judge.

## I. Introduction

In this action, Continental Casualty Company ("Continental") sues The Hartford Fire Insurance Company ("Hartford") claiming that Hartford is obligated to reimburse Continental for a portion of the amount of money which Continental spent to settle the underlying negligence action of *Woods v. Yater Medical Group,* Civil Action No. 92CA015701 (D.C.Super.Ct.) (the "*Woods* Action"). The parties filed motions for summary judgment and after oral argument, the Court denied the motions and agreed to reconsider the motions upon the parties' submission of a joint statement concerning the facts of this case. The parties jointly submitted a Statement of Facts and upon further consideration the Court concludes that the case may be resolved summarily. The Court holds that because the record does not contain any 1980 medical incidents which proximately caused injury to Tracina Woods, Hartford is not obligated to reimburse Continental for any sum of money which Continental spent to settle the *Woods* Action. The Court, therefore, shall grant Hartford's Motion for Summary Judgment and deny Continental's Motion for Summary Judgment.

## II. Facts

### The Policies

This case involves two insurance policies issued by Continental and Hartford. Continental issued a policy (the "Continental Primary Policy") to the Yater Medical Group ("Yater") for the period January 1, 1981 to January 1, 1982. (Continental and Hartford's Joint Statement ("Joint Statement") ¶ 1.) Dr. Howard N. Smith ("Dr. Smith") is a named insured under the Continental Primary Policy. (Id.) The policy provides limits of coverage of $1 million per claim and $1 million aggregate for Yater and its insured physicians, such as Dr. Smith. (Id.)

Section I of the Continental Primary Policy's Coverage Agreement provides, in relevant part, that Continental

> will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of ... [i]njury arising out of the rendering of or failure to render, during the policy period, professional services....

(Joint Statement ¶ 2.)

Pursuant to a separate excess policy, Continental afforded $10 million excess coverage jointly to Yater and Dr. Smith, for the same policy period, over the limits of the Continental Primary Policy. (Joint Statement ¶ 4.) The excess policy provides that Continental will indemnify Dr. Smith for the amount of loss which is in excess of $1 million. (Joint Statement ¶ 5.) The excess policy, however, contains an "Other Insurance" provision which denies coverage if Dr. Smith has other insurance to cover a loss. (Joint Statement ¶ 6.)

Hartford issued a policy to Yater as well. (Joint Statement ¶ 7.) The Hartford policy covers the period of May 1, 1980 to January 1, 1981. (Id.) The limit of liability under the Hartford Policy is $2 million per medical incident and $2 million aggregate. (Id.) Dr. Smith and Yater are named insureds under the Hartford Policy. (Id.)

Section I of the Hartford policy's Coverage Agreement provides, in relevant part, that Hartford will pay on behalf of the insured

[a]ll sums which the insured shall become legally obligated to pay as damages because of injury, to which this insurance applies, to any person caused by a medical incident which occurs during the policy period. . . .

(Joint Statement ¶ 8.) Section V of the Hartford policy defines the term "medical incident," in relevant part, as "any act or omission in the furnishing of professional medical or dental services to any person. . . ." (Joint Statement ¶ 9.)

**The Woods Case**

Ms. Montinella Woods first visited Dr. Smith for her pregnancy on September 8, 1980. (Joint Statement ¶ 12.) The cover sheet of the prenatal record of this first visit indicated that Dr. Smith recorded Ms. Woods' last menstrual period ("LMP") as May 2, 1980 and, in reliance on this date, he calculated a due date of February 7, 1981. (Id.) Ms. Woods claims that her menstrual periods were "always irregular." (Joint Statement ¶ 14.)

Dr. Smith performed a physical examination of Ms. Woods at the first visit and found the size of the uterus to be consistent with a 12 week fetus. (Joint Statement ¶ 15.) He ordered a sonogram and claims that he did so because he was uncertain about the date of conception. (Joint Statement ¶ 16.)

Dr. Kircherer, a radiologist, performed the sonogram on September 10, 1980; he estimated the fetal age to be approximately six weeks and reported that fetal parts were identifiable. (Joint Statement ¶ 17.) He recommended that a follow-up sonogram be performed approximately one month later for further evaluation. (Id.)

Dr. Smith testified that his working assumption "in the early part of pregnancy" was that Ms. Woods' due date was February 7, 1981 but that it was not the working date throughout the course of the pregnancy. (Joint Statement ¶ 12.) [1] Based on the discrepancy between the LMP and the sonogram, Dr. Smith believed, at or about the time of Ms. Woods' first visit, that Ms. Woods was "small for dates." (Joint Statement ¶ 22.) Once he realized that there was an inconsistency between the LMP and the initial sonogram he became concerned and he continued to have concerns all throughout the pregnancy. (Joint Statement ¶ 23.) One of Dr. Smith's specific concerns stemming from the initial sonogram was Intra Uterine Growth Retardation ("IUGR"). (Joint Statement ¶ 24.)

In 1980, Ms. Woods visited Dr. Smith at the Yater Clinic on four occasions for routine prenatal care. (Joint Statement ¶ 13.) On October 10, 1980 (the second visit), Dr. Smith performed a physical examination of Ms. Woods. (Joint Statement ¶ 25.) Based on this examination, Dr. Smith concluded that the size of the uterus was consistent with a fetal age of 12 weeks, which was the same conclusion Dr. Smith reached based on his examination four weeks earlier on September 8, 1980. (Id.)

Ms. Woods' first visit to Dr. Smith in the following year occurred on January 9, 1981. (Joint Statement ¶ 27.) Dr. Smith noted that the fetus was "[s]mall for dates" and that Ms. Woods may have been "[o]ne month off on date." (Id.) Dr. Smith testified that on that date he "was considering [IUGR] as a diagnosis." (Id.)

Between January 9, 1981 and February 11, 1981, Dr. Smith examined Ms. Woods on six different occasions. (Joint Statement ¶ 30.) On January 13, 1981, the second sonogram of Ms. Woods' pregnancy was performed. (Joint Statement ¶ 31.) Dr. Kircherer interpreted this sonogram as revealing a fetal age of 25.5 weeks. (Id.) A third sonogram performed on February 10, 1981 was reported to show a fetal age of 33 weeks. (Id.)

During this period, Dr. Smith had various estimates as to the due date. He testified that by January 18, 1981, he believed the baby was due the second week of March 1981. (Joint Statement ¶ 28.) As of January 23, 1981, he thought that the fetus was 33 to 35 weeks old. (Joint Statement ¶ 29.) When asked whether this estimate was based on

---

**1.** At several points in the deposition Dr. Smith claimed that he never changed the due date. The record is clear, however, that what he meant by this is that he never changed the prenatal record.

the LMP, he stated, "I based my information on how this thing was evolving, that if it just happens to be correlating with that last menstrual period, well, then so be it, but there was an ongoing evolving situation here that had led me to believe that I had a very sick baby." (Joint Statement ¶ 29.) It was his belief that, if on January 23, 1981 the fetus was 33 to 35 weeks old, there was IUGR. (Joint Statement ¶ 29.)

After seeing Ms. Woods on January 23, 1981, Dr. Smith noted that in his view the January 13, 1981 sonogram was "doubtful," and ordered a number of tests over the next week, including nonstress tests and oxytocin challenges. (Joint Statement ¶ 32.)

A nonstress test performed on January 30, 1981 came back nonreactive. (Joint Statement ¶ 33.) On that same day, Dr. Smith ordered another nonstress test and biweekly testing of serum estriol levels. (Joint Statement ¶ 34.) He did so because there was information suggesting IUGR and he wanted a method of monitoring fetal well-being. (Joint Statement ¶ 35.) In the late 1970's and early 1980's, Dr. Smith tested serum estriol levels as one "tool" to assess fetal well-being. (Joint Statement ¶ 34.)

Tests performed on February 4, February 6, and February 11, reflected a serum estriol level of 3.3 NG/ML. (Joint Statement ¶ 36.) A test performed on February 13 (and reported on February 15), however, showed a thirty percent drop in the serum estriol level from 3.3 NG/ML to 2.3 NG/ML. (Id.)

Dr. Smith testified that during this period he believed that an acute drop meant that the fetus was in jeopardy because the fetus and placenta as a unit would not be functioning maximally. (Joint Statement ¶ 37.) Furthermore, he stated that an acute drop itself was a reason to deliver a baby early. (Id.) Dr. Smith testified that he experienced an acute drop in serum estriol levels with patients "a small number of times" and he delivered each of those infants. (Id.) Dr. Smith said that a further finding of oligohydramnios (insufficient amniotic fluid) would cause him to deliver the baby; if the amniotic fluid were normal he would hold off, perform further tests and order bed rest in the hospital until he "was satisfied that everything

was okay and she went into labor." (Joint Statement ¶¶ 43, 44.)

Upon receiving word on February 15, 1981 of the precipitous drop in the serum estriol level he admitted Ms. Woods to the hospital in order to perform additional monitoring, keep her in bed and possibly deliver the baby if there were other reasons to be concerned regarding IUGR. (Joint Statement ¶ 38.) Dr. Smith stated that he intended to keep Ms. Woods in the hospital until she delivered. (Joint Statement ¶ 39.)

On February 17, 1981, after admitting Ms. Woods into the hospital, Dr. Smith ordered an amniocentesis and a fourth sonogram. (Joint Statement ¶ 40.) On February 18, 1981, Dr. Sobel, the chief resident, reported he was unable to perform the amniocentesis because there was insufficient amniotic fluid. (Joint Statement ¶ 46.) The sonogram showed "only a small amount of amniotic fluid present." (Joint Statement ¶¶ 40, 47.) According to Dr. Smith, oligohydramnios is a "serious finding," "a finding[ ] that indicate[s] a very serious problem." (Joint Statement ¶ 41.)

Dr. Smith testified that, as of February 18, 1981, he thought the fetus had IUGR and was in "serious trouble." (Joint Statement ¶ 43.) He said, "On the basis of the falling estriols and the decrease in the amniotic fluid, I felt that we, indeed, had Intra Uterine Growth Retardation and that this baby was very compromised and should be delivered the following morning." (Joint Statement ¶¶ 42, 48.) He claims that he was concerned with symmetrical IUGR, which means "lagging growth throughout the whole pregnancy." (Joint Statement ¶ 43.) Furthermore, he testified that one "alleviates that concern by delivering the baby" or else one "wait[s] for the baby to die." (Id.)

He further stated that one of the factors that he considered in deciding to deliver the baby was the fact that he had diagnosed the fetus with IUGR. (Joint Statement ¶ 45.) In diagnosing IUGR, he said he took into consideration the information regarding the LMP. (Id.)

On February 19, 1981, Dr. Smith delivered the baby, Tracina Woods. (Joint Statement

¶ 58.) At the time Tracina was born, Dr. Smith believed that her fetal age was between 36 to 37 weeks and that she was due the second week of March 1981. (Joint Statement ¶ 53.) This was his estimate even though he said that he "couldn't pinpoint down that due date." (Joint Statement ¶ 55.) The neonatologist who observed the baby immediately after birth estimated fetal age to be 35 weeks. (Joint Statement ¶ 53.) The plaintiffs' experts in the *Woods* Action believed that the fetal age at birth was between 31 to 33 weeks. (Joint Statement ¶ 53.) If Ms. Woods' reported LMP were an accurate indicator of fetal age, Tracina would have been approximately 42 weeks—two weeks postmature—at birth. (Id.)

Dr. Smith testified that he would have delivered Tracina Woods on February 19, 1981, even if presented with the same situation yet knowing with medical certainty that her fetal age was as low as 26 to 28 weeks. (Joint Statement ¶ 54.) He stated, "I believe that regardless of the length of gestation, there was less risk outside the womb than inside the womb when we delivered this baby." (Id.)

After birth, Tracina Woods experienced respiratory problems. (Joint Statement ¶ 59.) She suffered incidents of anoxia (lack of oxygen) and was intubated and oxygenated. (Id.) Several years later she was diagnosed with cerebral palsy, spastic diplegia, and other physical disorders. (Id.)

A suit was brought in the District of Columbia Superior Court on December 7, 1992. (Joint Statement ¶ 60.) The Complaint in the *Woods* Action alleged that Dr. Smith negligently delivered Tracina Woods prematurely and, as a result, Tracina developed her physical disorders. (Id.)

Hartford and Continental funded the defense of the *Woods* Action. On December 17, 1993, after the conclusion of discovery, Hartford notified Continental that it intended to withdraw from the action. (Joint Statement ¶ 79.) On July 19, 1994, the day that jury selection in the *Woods* trial was scheduled to commence, the parties reached an agreement with the plaintiffs to settle the case for $4,127,554.00. (Joint Statement ¶ 83.) Hartford declined to participate in the settlement. (Joint Statement ¶ 84.) On August 15, 1994, Continental funded the *Woods* settlement. (Joint Statement ¶ 85.) Subsequently, Continental brought this action to recoup from Hartford a portion of the sum of money that Continental paid to the plaintiffs in the *Woods* Action.

## III. Discussion

### A. Summary Judgment

The Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of . . . [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A party opposing a motion for summary judgment must go beyond the pleadings and provide affidavits or "depositions, answers to interrogatories, and admissions on file" in order to designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. (quoting Fed.R.Civ.P. 56(e)). Summary judgment will not lie if a reasonable jury could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### B. The Hartford Policy and 1980 Medical Incidents

Continental presents a straightforward theory of the case. It alleges that Dr. Smith's delivery of Tracina Woods was premature and that the delivery was motivated by his IUGR diagnosis, which in turn resulted from his belief formed near the outset of the pregnancy that the fetus was "small for dates" because of the discrepancy between the initial sonogram and Ms. Woods' LMP. (Pl.Mem. P & A at 15–16.) Furthermore, Continental argues that (1) given the irregu-

larity of Ms. Woods' menstrual periods, Dr. Smith gave undue significance to the LMP in calculating the due date; and (2) in light of the discrepancy between the LMP and the initial sonogram, Dr. Smith should have performed serial sonograms in 1980 in order to determine the age of the fetus with greater accuracy. (Id. at 16.) Continental concludes that if Dr. Smith had performed such tests, "he very likely would have discovered that the fetus was at least several weeks younger than he believed." (Id.)

For analytical purposes the Court assumes that, although the facts of the underlying case were never found by a jury or court, Tracina Woods' injuries stemmed from a premature delivery. The Court's task is to determine whether Tracina's injury was caused by any act or omission of Dr. Smith in his medical treatment of Ms. Woods in 1980.

 When applying an insurance policy that covers injuries "caused by" a medical incident, the Court must determine the proximate cause of an injury. *Quadrangle Development Corp. v. Hartford Ins. Co.,* 645 A.2d 1074, 1076 (D.C.1994). As the Supreme Court held in *Aetna Insurance Co. v. Boon,* 95 U.S. 117, 130, 24 L.Ed. 395 (1877):

> The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, though they may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster.

The Court also described proximate cause as "the dominant cause[.]" *Id.* 95 U.S. at 133. In trying to distinguish a proximate cause from a remote cause, "[t]he inquiry must always be whether there was any intermediate cause disconnected from the primary fault, and self-operating, which produced the injury." *Id.* (quoting *Milwaukee & Saint Paul Railway Co. v. Kellogg,* 94 U.S. 469, 475, 24 L.Ed. 256 (1876)).

In this case, Dr. Smith decided to perform the cesarean section based on certain information that he had acquired during Ms. Woods' course of prenatal treatment. The Court does not regard the delivery as the proximate cause of Tracina's injuries because the operation, although nearer in time to the injury, was incidental to the dominant cause which was particular information gathered from prenatal tests that, in Dr. Smith's mind, dictated the premature delivery. Consequently, the Court must resolve the issue of proximate cause by determining the basis for Dr. Smith's decision to perform the cesarean section.

The Court holds that a reasonable jury could not find by a preponderance of the evidence that Continental is entitled to a verdict because the evidence demonstrates that Dr. Smith's decision to perform the cesarean section was not based either specifically on the LMP or generally on his estimate of fetal age. Even if the Court were to assume that Dr. Smith performed substandard care in not determining the correct fetal age in 1980, the 1981 serum estriol level and amniotic fluid readings upon which Dr. Smith relied, served as an intermediate cause of injury apart from the failure to determine fetal age.

### 1. LMP

The evidence shows that Dr. Smith calculated a due date of February 7, 1981 at Ms. Woods' first visit using her LMP estimate. Dr. Smith stated that he relied on this due date only in the "early part" of the pregnancy and ordered the first sonogram because he was uncertain about her date of conception. He stated that he based his estimate of fetal age on how the fetus was "evolving" and that any correlation with the LMP was coincidental. By January 18, 1981 he believed the due date to be the second week of March; on January 23, 1981 he estimated the fetal age to be 33 to 35 weeks; at the time of delivery he dated the period of gestation at 36 to 37 weeks. The evidence, therefore, shows that he clearly had abandoned the due date of February 7, 1981 and, logically, the LMP.

The inconsistency between the LMP and the sonogram, however, did raise a "concern" that the fetus might have been suffering from IUGR. It would be natural for a doctor

to be concerned if the LMP given by the patient is inconsistent with tests performed on the fetus. The record is clear, however, that by January 9, 1981 Dr. Smith still had not diagnosed the fetus as suffering from IUGR. He did not diagnose IUGR until later in 1981.

Continental places emphasis on Dr. Smith's comment that he "considered" the LMP in diagnosing IUGR. In any decision-making process a careful decisionmaker considers all possible factors before accepting some and rejecting others. When viewed in the light of his very specific comments and the documentary record which indicate a rejection of the LMP, the only reasonable interpretation of this statement is that Dr. Smith did consider the LMP as part of all of the collected information before ultimately rejecting it as a basis for an IUGR diagnosis and the subsequent decision to perform the cesarean section.

The decision to deliver Tracina was based on two test results that, in Dr. Smith's mind, indicated a lack of fetal health: a thirty percent drop in the serum estriol level and insufficient amniotic fluid.

### 2. Fetal Age

Continental contends that if Dr. Smith had performed serial sonograms in 1980 "he very likely would have discovered that the fetus was at least several weeks younger than he believed[ ]" and he never would have performed the cesarean section on February 19, 1981. (Pl.Mem. P & A at 16.)

Dr. Smith testified in his deposition testimony that the age of the fetus was not a factor in his decision to perform the cesarean section. Absent evidence to the contrary, the Court cannot rule that his failure to conduct serial sonograms in the early part of the pregnancy was the proximate cause of Tracina's injury.

At most, Dr. Smith's estimate of fetal age prompted a "concern" that the baby may have suffered from IUGR. This suspicion motivated him to test the serum estriol levels. Dr. Smith's estimate of fetal age, therefore, caused the tests not the cesarean section. Although Dr. Smith's estimate of fetal age is conceivably in the chain of causation, it by no means qualifies as a "dominant cause" of the delivery. It is only the results of those tests and the oligohydramnios finding that proximately caused the delivery.

Continental has not demonstrated how Dr. Smith's estimate of fetal age influenced his perception of the test results thus dictating, in Dr. Smith's view, the cesarean section. In other words, there is no evidence that if Dr. Smith's estimate agreed with that of the Woods's experts the test results would not have prompted him to perform the cesarean section.

The tests results were independent of fetal age. Indeed, Dr. Smith believed that serum estriol levels should not decline, regardless of age. In addition, Dr. Smith's concerns regarding the level of amniotic fluid would have only increased had his estimate of fetal age agreed with that of the Woods's experts.

Continental argues that the chain of causation may not be broken by Dr. Smith's testimony alone. Continental illustrates its point by analogizing to a surgeon who negligently leaves a surgical sponge in a patient and then defends himself by blaming another doctor. In the hypothetical situation, the plaintiff can avoid summary judgment by rebutting the surgeon with evidence (e.g. eyewitnesses, contradiction by the second doctor). If the surgeon's testimony goes unrebutted, then judgment in his favor might be appropriate.

Likewise, Dr. Smith's recollection may be challenged but it cannot be dismissed as insufficient. Continental's burden in this regard is formidable because it must present evidence that reveals Dr. Smith's decision-making process. Continental's hypothetical presents a scenario more susceptible of proof. Proof of a physical act (leaving a surgical sponge) is more readily available than evidence of a thought process (factors influencing a decision to operate).

Continental also challenges Dr. Smith's hypothetical claim that he would have delivered Tracina even if he had thought that she was 26 weeks old. Continental argues that

this is merely speculation and of no value.[2] The hypothetical used here is simply a device for isolating the fact that his estimate of fetal age did not influence his decision to operate. The hypothetical contained all facts and medical information known by Dr. Smith on February 18, 1981 with the exception of fetal age. The hypothetical does nothing more than augment his statement that, in the context of actual events, the baby was delivered "regardless of the length of gestation."

## IV. CONCLUSION

Dr. Smith did not base his decision to perform the cesarean section delivery of Tracina Woods on his estimate of Tracina's period of gestation or on the LMP reported by Ms. Woods. The Court, therefore, holds that the record does not contain any 1980 medical incidents which could have proximately caused the injury to Tracina. The Court, therefore, shall grant Hartford's Motion for Summary Judgment and deny Continental's Motion for Summary Judgment.[3]

2. The Court notes that Continental's arguments as to the "very likely" results of serial sonograms are vulnerable to the same charge.

3. The Court's ruling obviates the need to reach the issue of notice under the Hartford policy or the Rule 56(e) issue raised by Hartford.